**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Andrea Wagner, | ) | |
| | ) | **ORDER DENYING PLAINTIFF'S** |
| Plaintiff, | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | **AND GRANTING DEFENDANT'S** |
| vs. | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| Carolyn W. Colvin, Acting Social Security | ) | |
| Administration Commissioner, | ) | Case No. 1:14-cv-006 |
| | ) | |
| Defendant. | ) | |

The plaintiff, Andrea Wagner ("Wagner"), seeks judicial review of the Social Security Commissioner's denial of her application for Social Security Disability Insurance Benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-434. This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## I.     BACKGROUND

### A.     Procedural history

Wagner filed an application for Social Security Disability Insurance Benefits ("DIB") on March 1, 2011, alleging an onset date of August 30, 2010. (Tr. 90, 171-177). Her application was denied initially and upon reconsideration. (Tr. 118-126).

An Administrative Law Judge ("ALJ") convened an administrative review hearing on August 10, 2012. (Tr. 32-89, 126). He issued a written decision denying Wagner's application on November 14, 2012. (Tr. 19-26). The Appeals Council denied Wagner's subsequent request for review and on November 20, 2012, adopted the ALJ's decision as the Commissioner's final decision. (Tr. 1-4, 284-88).

Wagner initiated the above-entitled action on January 21, 2014, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket No. 1). The parties have since filed summary judgment motions that are now ripe for review. They have also filed notice of their consent to the undersigned's exercise of jurisdiction over this matter.

### B. Factual background

#### 1. Wagner's personal data and work history

Wagner was born in 1966. (Tr. 90). She was 44 years old on the alleged onset date and 46 years old on the date of her administrative hearing. (Tr. 36, 90). She is married and has five children, two of whom are under the age of eighteen and none of whom live with her. (Tr. 38).

Wagner has an eighth or ninth grade education. (Tr. 42). She has at various times worked as a waitress, housekeeper/cleaner, dishwasher, and garment sorter. (Tr. 45-46). In the years immediately preceding her alleged onset date, she worked intermittently as a laborer in the food service industry. (Tr. 45, 207-210, 214, 224-231). She attempted to return to work on a part-time basis in 2012 but was unsuccessful. (Tr. 43-44, 207-210).

Wagner suffers from the following impairments: obesity; degenerative disc disease at multiple levels, chronic back and neck pain, left knee pain, a major depressive disorder, post-traumatic stress disorder, anxiety, a borderline personality disorder, and borderline intellectual functioning. (Tr. 13). She also has a history of polysubstance abuse, Hepatitis C, asthma, and uterine prolapse with grade 3-4 cystocele. (Tr. 13, 498-99). She has been fitted for and prescribed a pessary. (Tr. 498-99).

#### 2. Summary of Wagner's relevant medical history

Wagner presented to the emergency room multiple times in mid-to-late March 2010 with

complaints of dental pain and/or headaches. (Tr. 401-427).

On March 23, 2010, Wagner presented to a psychiatrist, Dr. Thomas Eick, who made the decision to discontinue Paxil, retry Zoloft, continue her on a lower dosage of Remeron, and increase her dosage of Klonopin. (Tr. 358).

On April 20, 2010, Wagner returned to Dr. Thomas Eick for a follow-up examination. (Tr. 356-57). According to Dr. Eick's notes, Wagner was tearful, anxious, and at times irritable when told he would no longer prescribe her Klonopin or other benzodiazpines. (Tr. 356).

On April 28, 2010, Wagner was placed in emergency detention after she presented for a psychiatric evaluation with symptoms of psychosis. (Tr. 302-09, 334-38). According to the admitting physician's notes, Wagner had been self medicating her mood with substances, was anxious over the fact that she had overused/exhausted her supply of Klonopin, was having troubled sleep, was withdrawing from benzodiazepines, was struggling to cope with traumatic events (both past and present) in her personal life, and was dealing with ongoing anxiety and depressive symptoms. (Tr. 305-06, 337-38).

By April 30, 2010, Wagner's mood had sufficiently stabilized to warrant her release from emergency detention. (Tr. 309). She was discharged with two-week prescriptions for Klonopin, Inderal, and Remeron and instructed to follow up with her primary care physician. (Id.)

On May 27, 2010, Wagner returned to Dr. Thomas Eick, seeking a refill of her Klonopin prescription. (Tr. 353). Dr. Eick unequivocally refused to prescribe her Klonopin given her past misuse. (Tr. 354). He did, however give her some samples of Lunesta, started her on Trileptal in an effort to stabilize her mood, and continued her on Neurontin and Zoloft. (Tr. 353).

On June 18, 2010, Wagner presented to Dr. Shelley Siefert at the Mid Dakota Clinic with

complaints of neck pain. (Tr. 344-45). According Dr. Siefert's notes, Wagner was given Toradol at the clinic and further prescribed Soma and Flexeril. (Id.).

On June 21, 2010, Wagner reported to the emergency room with complaints of a "global headache." (Tr. 397). Radiology reports from St. Alexius Medical Center indicate that an MRI taken of Wagner's head on July 6, 2010, revealed no abnormalities. (Tr. 392-93).

Wagner returned to the emergency room on August 12, 2010, this time with complaints of chronic lower back pain. (Tr. 326). She was given pain medication, prescribed Flexeril and Lorcet, and instructed to follow up as needed with her primary care physician. (Tr. 327).

Wagner returned to the emergency room on August 14, 2010, again complaining of lower back pain. (Tr. 324). She was given pain medication and along with another prescription for Flexeril. (Tr. 325). She was also advised to limit her use of anti-inflammatories, ice or heat her lower back, and follow up with her primary care physician. (Id.).

Whatever relief Wagner obtained appears to have been short lived as her medical records reflect that she was hospitalized from August 15-17, 2010, for "intractable low back pain" and "numerous psychiatric comorbidities." (Tr. 310). In his discharge summary, Dr. Biron Baker reported that Wagner was started on IV pain medications upon her admission to the hospital on August 15th, that "[t]hings resolved rather nicely for her," and that she had been released from the hospital in good condition on August 17. (Tr. 310). He also noted that an MRI taken of Wagner's lumbar spine on August 16, 2010, showed "mild diskogenic disease at multiple levels" but "no evidence of canal stenosis or nerve root compression." (Id.).

On December 15, 2010, Wagner returned to Mid Dakota Clinic, where she was treated by Dr. Siefert for neck, arm and leg pain, a herpetic lesion on her right buttock, anxiety, and a sinus

infection. (Tr. 341-43).

Wagner returned to Dr. Eick on December 28, 2010. (Tr. 349-50). During the course of her visit with Dr. Eick, she advised that she had been experiencing uncontrolled anxiety and PTSD symptoms and "wante[ed] to be hospitalized for six months so someone could come up with the correct diagnosis." (Tr. 349). She did, however, deny having any self harm thoughts and did not, in Dr. Eick's opinion, display any bizarre behavior. (Id.). Dr. Eick suggested that she retry Seroquel at bedtime, gave her samples of her current medications (Paxil and Xanax), and instructed her to follow up in four weeks. (Tr. 350).

Wagner presented to the emergency room on January 12, 2011, seeking treatment for a left knee injury. (Tr. 383-86). She was discharged with instructions to ice her knee intermittently, wear a knee immobilizer until better, bear weight as tolerated, and continue with her current pain medications (Tylenol with Codeine #3 and over-the-counter ibuprofen). (Tr. 387).

On April 12, 2011, Wagner reported to Dr. Eick for a followup exam. (Tr. 436). Dr. Eick observed that Wagner's mood had improved and that she appeared more stable than on her last visit. (Id.). His plan was to continue Wagner on Paxil until her prescription ran out and then start her on Wellbutrin, discontinue Seroquel and have her try Hyrdoxyzine for her anxiety, and start her on Ambien. (Tr. 436-37). Days later he discontinued her Ambien and started her on Temazepam. (Tr. 434).

Wagner presented to the emergency room on April 23, 2011, with complaints of pain in her left side. (Tr. 374). According to nursing progress notes, she was issued a prescription for Vicodin at the time of her discharge. (Tr. 376).

Wagner returned to the emergency room on April 23, 2011, with abdominal pain. (Tr. 374-

79, 381).  She was diagnosed with "probable left renal colic."  (Id.).  She was discharged with instructions to take her prescribed pain medication (Vicodin) every four hours as needed and over-the-counter pain medication (naproxin) in accordance with label instructions. (Tr. 378).

On May 10, 2011, Wagner presented to Dr. Eick.  (Tr. 434).  She reported that the Wellbutrin had helped her focus and mood.  (Id.).  Dr. Eick's noted that her mood continued to improve with appropriate affect.  (Id.).  His plan was to continue her on Wellbutrin and Hydroxyzine, increase her dosage of Restoril, and see her again in one month's time.  (Id.).

Wagner followed up with Dr. Eick on June 7, 2011, reporting that she had been doing better overall and had "been doing a lot of sandbagging and helping out in the community which [made] her feel good." (Tr. 440).  According Dr. Eick's notes, Wagner's mood was good, her affect was appropriate, and she exhibited no irritability.  (Id.).  Dr. Eick discontinued her hydroxyzine but continued her Wellbutrin and Restoril and instructed her to follow-up in approximately two months. (Id.).

On June 30, 2011, Wagner presented to the emergency room with complaints of moderate pain in her lower lumbar spine that radiated to her right lower extremity.  (Tr. 451).  On examination she exhibited no bladder dysfunction, sensory loss, motor loss, or weakness. (Tr. 451-52).  Her gait, reflexes, mood, and affect were normal.  (Id.).  She was prescribed Vicodin for the pain and discharged with instructions to follow up with her primary care physician should her symptoms persist or worsen.  (Tr. 452).

Wagner next followed up with Dr. Eick on August 16, 2011.  (Tr. 464).  According to Dr. Eick's notes, she presented with paranoia, pressured speech, racing thoughts, and an increase in mood swings. (Tr. 464-65).  Although there was some talk of hospitalization, she made the decision

to first try to see if she get could control of her symptoms with medication. (Tr. 464).

Wagner returned to Dr. Eick on August 30, 2011, to discuss problems she was having with her adult daughter. (Tr. 462). Dr. Eick reported that Wagner's affect was odd, her mood was elevated, her speech was rapid, and that she was easily distracted. (Id.).

On September 27, 2011, Wagner submitted to a consultative examination by Dr. Paul Jondahl. (Tr. 456-59). She reported to Dr. Eick for a follow up later that same day. (Tr. 460). In Dr. Eick's opinion, she appeared to have improved since her last visit. (Id.). Specifically, he noted that her speech was less pressured, her mood had improved, and her thoughts were a little more logical and coherent. (Id.). He adjusted her medication and instructed her to follow up in a month. (Id.).

On October 20, 2011, Wagner presented to the emergency room with complaints of neck pain and headache. (Tr. 470). A CT scan of her head and neck was negative. (Id.). She was issued prescriptions for Flexeril and ibuprofen 800 and discharged in stable condition. (Id.).

Wagner returned to the emergency room the following day with complaints of headache, muscle pain, cervical spinal pain, and nausea. (Tr. 470). She was given Torodal and Norflex. (Tr. 471).

Wagner next followed up with Dr. Eick on October 25, 2011. (Tr. 466). Thereafter, Wagner returned to Dr. Eick on an almost monthly basis through May 22, 2012. (Tr. 477-488). According to progress notes, Wagner's mood swings stabilized, her speech was no longer pressured, her affect was appropriate, and she exhibited no psychotic symptoms. (Id.).

On December 19, 2011 Wagner presented to Medcenter One's Women's Medical Center with concerns that she had a uterine prolapse. (Tr. 504). She was examined by Nurse Practitioner

Debra Dockter, who ordered an ultrasound. (Tr. 504-05). She returned on January 10, 2012, for a pessary fitting. (Tr. 503).

On January 17, 2012, Wagner reported to NP Dockter for a followup regarding her pessary. (Tr. 502). According to NP Dockter's notes, Wagner reported that she was doing very well. (Id.).

On March 12, 2012, Wagner presented to Dr. Jill Klemin for a preoperative physical examination in anticipation of a surgery to help with her uterine prolapse. (Tr. 498). According to the treatment notes, there was some initial confusion as to whether Wagner's had received a recommendation from NP Dockter for surgery. (Id.). Dr. Klemin was able to clarify with NP Dockter that this was not in fact the case. (Id.). Dr. Klemin went on to note that Wagner's previous examination with NP Dockter had shown she had a cystocele and rectocele but no true uterine prolapse. (Id.).

Wagner presented to NP Dockter on April 14, 2012, reporting that she was having problems with her pessary. (Tr. 500). On examination she exhibited no evidence of uterine prolapse. (Tr. 501). NP Dockter referred her to a physician for further evaluation. (Id.).

### 3.    Consultative physical examination

As noted above, Wagner submitted to a consultative physical examination on September 27, 2011. According to the consulting physician, Dr. Jondahl, Wagner was able get on and off the exam table, walk on her heels and toes, and squat all the way down and stand up without assistance. (Tr. 458). Her upper and lower motor exam and reflexes were normal. (Id.). As for her affect, she cried "incessantly" throughout the exam. (Id.).

Dr. Jondahl opined that Wagner was emotionally unstable, in need of more frequent psychiatric treatment, and "really would [be] unemployable." (Tr. 459). As for her back pain, Dr.

Jondahl stated that it "would need to be treated extensively with physical therapy." (Id.).

### 4. Administrative hearing

#### a. Wagner's testimony

The ALJ convened a hearing on August 10, 2012. Two persons gave testimony during the hearing, Wagner and a vocational expert.

Wagner testified that her most severe physical problem was her neck and back pain. (Tr. 48). When asked to elaborate, she testified that the pain was excruciating and constant, that it radiated down the center of her back and at times into her arms and legs, and that it was exacerbated by walking, standing, or laying down for extended periods. (Tr. 48-49, 53). When asked to rate her pain on a scale of 1-10, with 10 being the most severe, she responded that it averaged an 8. (Tr. 49). When asked whether she relied on any assistive devices, she responded that she used a walker maybe once a month to get around her house and a cane about fifty percent of the time. (Tr. 41-42).

Wagner went on to testify that her various physical issues– her degenerative disc disease, back and neck pain, left knee pain, left hand pain, and uterine prolapse –not only prevented her from performing any meaningful work, but had made it difficult to comfortably carry anything weighing more than five pounds, walk any farther than half a block, or stand more than a half an hour. (Tr. 48-63, 78-81). She further advised that, because of her incontinence issues, she changed clothes (with her husband's assistance) up to four times per day. (Tr. 80). Segueing to the issue of her mental health, Wagner discussed at some length her ongoing struggles with depression, anxiety, attention deficit, and memory issues. (Tr. 63-69).

With respect to her daily activities, Wagner testified that she struggled to get out of bed on account her depression, had little social interaction outside of biweekly church outings, had no

hobbies to speak of, watched little television, no longer drove, required her husband's assistance when tending to her personal needs, and could no longer perform certain household chores. (Tr. 66, 75-77).

## b.     Vocational expert's testimony

When examining the vocation expert, the ALJ first inquired whether an individual with Wagner's vocational profile could perform Wagner's past relevant work if she: (a) could lift 10 pounds frequently and 20 pounds occasionally; (b) could sit, stand, and/or walk for a total of 6 hours in an 8-hour day; (c) could occasionally climb stairs and ramps; (d) could not climb ladders or scaffolds; (e) could not work at unprotected heights or around moving mechanical parts; (f) could only interact with supervisors on a superficial basis; (g) should not interact with the general public; (h) could only understand, remember, and carry out simple instructions; and (i) could only make simple, work-related decisions. (Tr. 82-87). Second, he inquired whether an individual with Wagner's vocational profile and aforementioned mental restrictions could perform Wagner's past relevant work if she: (a) could lift less than 10 pounds frequently and 10 pounds occasionally; (b) could sit for 6 hours but only stand and/or walk for 2 hours; (c) needed to avoid uneven terrain; (d) could occasionally balance or stoop; and (e) was rarely able to crouch, kneel or crawl. (Id.). Third, he inquired whether the individual he had just described could work if she: (a) needed to take frequent breaks due to pain-control issues, incontinence, mental impairments, or any other reason; or (b) was unable to maintain attention or concentration for two-hour segments. (Id.).

The vocational expert responded that the individual described in the first hypothetical could perform Wagner's past relevant work. (Id.). As for the individual described in the second hypothetical, the vocational expert testified that she would not be able to perform Wagner's past

10

relevant work but could perform a range of unskilled and sedentary jobs so long as she did not require frequent, prolonged breaks and could maintain attention and concentration for two-hour segments.  (Id.).

### 5. Consultative psychological examination

Following the hearing, the ALJ arranged for a consultative psychological evaluation by Dr. Ed Kehrwald.  This was performed on August 31, 2012.  (Tr. 516-22).  According to Dr. Kehrwald's report, Wagner did not exhibit any gross difficulty with ambulation upon her arrival at the examination but reported endurance limitations with movement, had a rather flat affect during the interview, and made a good effort when tested.  (Tr. 521).  Based upon her test results and answers to his inquiries, Dr. Kehrwald concluded:

> Mental status results suggested functioning was in the low-average to borderline range, with aspects of verbal reasoning that were stronger.  Her concentration and mental sequencing were weaker.  Prognosis for improvement is guarded.
>
> Should she receive benefits, she would appear to be able to manage her own payments, with some assistance.
>
> Based on the above evidence, the undersigned would be inclined to provide the following diagnoses:
>
> Axis I:          Major Depressive Disorder with psychotic symptoms
> PTSD by hx
> Anxiety Disorder hx
>
> Axis II:         Borderline Personality Disorder by hx
> Borderline Verbal Intellectual Functioning, per test scores
>
> Axis III:        Emphysema, costochondritis, possible joint disease, past CHIs with residual problems.
>
> GAF = 55
>
> Past addition issues reported to be in full remission for a number of years.

Her functioning would appear to be limited by her lapses in concentration, some forgetfulness, and reduced persistence. She also may be less consistent in functioning or in attendance secondary to depression or anxiety. Her judgment was adequate and one might expect her to have some irritability with others but to relate in a normal fashion with the general public. She may perform better with more routine, nonpublic work. She may qualify for services from Vocational Rehabilitation. She should continue with her medication therapy. Some counseling related to her depression, anxiety, and adjustment to her current functioning may be helpful.

(Tr. 521-22).

C. **ALJ's decision**

The ALJ employed the five-step sequential analysis when evaluating Wagner's application. At step one, he observed that Wagner had not engaged in any substantial gainful activities since August 30, 2010, her alleged onset date. (Tr.12). At step two, the ALJ recognized that Wagner suffered from the following severe impairments: obesity; history of back pain; major depressive order with psychotic symptoms; history of post-traumatic stress disorder; anxiety disorder; borderline personality disorder; and borderline intellectual functioning. (Tr. 12-14).

Moving on to step three, the ALJ concluded that none of Wagner's aforementioned impairments, either singly or in combination, were presumptively disabling. (Tr. 14-15).

At step four, the ALJ made the following determination with respect to Wagner's residual function capacity:

[C]laimant has the residual functional capacity to perform less than the full range of light work as defined by 20 CFR 404.1567(b) and 416.967(b). The claimant is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders/scaffolds, work at unprotected heights or work with moving mechanical parts. Mentally, the claimant retains the capacity to understand, remember and carry out only short, simple instructions. The claimant is able to interact appropriately with supervisors and co-workers on a brief and superficial basis, but must not have

contact with the public.  The claimant can respond appropriately to change in a routine work setting and make judgments on simple work-related decisions.

(Tr. 15-16).  In so doing the ALJ acknowledged that Wagner's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (Tr. 17).  He nevertheless discounted Wagner's testimony regarding the intensity, persistence, and limiting effects of these symptoms on the ground that it was inconsistent with the record as a whole.  (Tr. 16-24).  Included in the reasons given by the ALJ for discounting Wagner's testimony were:  (1) her gainful employment leading up to the period of alleged disability; (2) her "lackadaisical" effort to obtain the benefit of job rehabilitation services when her claimed impairments limited her capabilities; (3) missed appointments with her psychiatrist; (4) her favorable response to pain medications in terms of stabilizing her pain complaints in her lower back; (5) what appeared to be an improvement in her mental condition over time; (6) her report to her psychiatrist in June 2011 that she had engaged in a lot of "sandbagging" and community volunteer work; (7) inconsistencies in some of her accounts regarding her limitations; (8) what he viewed as her relatively normal physical exams, including the consultative physical examination by Dr. Jondahl where, putting aside what the ALJ characterized as her "tearful presentations," she was able to get on and off the examination table without assistance, walk on her heels and toes, she could squat all the way down and stand up without assistance, and where Dr. Jondahl noted no physical limitations; (9) her Global Assessment of Functioning ("GAF") that suggested to the ALJ fairly mild mental issues; (10) the RFC assessments by the state agency consultants; and (11) the results of the consultative report by psychologist Dr. Kehrwald that reported some mental limitations but stated that Wagner "may perform better with more routine, nonpublic work" and that "some counseling related to her depressions, anxiety, and adjustment to her current functioning may be helpful."  (Tr.  15-24).

As for Dr. Jondahl's assessment that Wagner was emotionally unstable and unemployable, the ALJ stated:

> this assessment is afforded little weight as it is not consistent with the overall evidence of record. Particularly noteworthy was the fact that the claimant presented to her psychiatrist, Dr. Eick, later that same day . . . in a fundamentally stable manner with no mention of crying. Of note, the claimant was described as improved in mood with thoughts more logical and coherent that previously. While the undersigned accepts that the claimant's mental impairments are severe, they are not disabling.

(Tr. 23) (internal citations omitted). In addition, the ALJ gave more weight to the consultative psychological assessment of Dr. Kehrwald.

Moving on to the fifth and final step of his analysis, the ALJ initially acknowledged that Wagner could not perform her past relevant work of dishwashing, which the ALJ categorized as medium-level work. (Tr. 24). However, based upon the vocational expert's answers to his hypotheticals, he was of the opinion that she remained capable of performing a full range of other light, unskilled light work that existed in significant numbers in the national economy. (Tr. 24-25). As a consequence, he concluded that Wagner was not disabled as defined by Social Security Act. (Tr. 25).

## II.    GOVERNING LAW

### A.    Law governing eligibility for adult benefits

An individual shall be considered to be disabled for purposes of DIB if the person is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. E.g., Hilkenmeyer v. Barnhart, 380 F.3d 441, 443 (8th Cir. 2004); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see 42 U.S.C. §§ 423(d)(1)(A),  1382c(a)(3)(A).

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)[1] and determine:

(1)     whether the claimant is presently engaged in a substantial gainful activity,

(2)     whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth or fifth steps, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d

---

[1]  The provisions in 20 CFR Part 404 apply to DIB and the provisions in Part 416 apply to SSI benefits.

1320 (8th Cir. 1984).[2] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005) ("Ellis"). A claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218.

## B.    Standard of review

The scope of this court's review is limited. The court it is not permitted to conduct a *de novo* review. Rather, it must look at the record as a whole to determine whether there is substantial evidence to support the Commissioner's decision. Ellis, 392 F.3d at 993.

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. E.g., Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) ("Buckner"). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id. Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. Id.; Buckner, 646 F.3d at 556 ("Rather, if, after reviewing the record, we find that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner.") (internal quotations and citations omitted).

In conducting its review, the court is required to afford great deference to the ALJ's

---

[2] The Polaski factors are now embodied in 20 C.F.R. §§ 404.1529, 416.929.

credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) ("Haggard"); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993) ("Brockman"). The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) ("Anderson").

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis, 392 F.3d at 993.

## III.    DISCUSSION

Wagner takes issue with the ALJ's assessment of her credibility, RFC determination, and, by extension, his hypotheticals to the vocational expert. The major focus of her attack is upon the the ALJ's conclusion that she could work in a competitive environment, which, according to the vocational expert, required Wagner having on an average no more than one absence per month despite her severe impairments. Wagner contends that she cannot because of the combination of her mental and physical impairments. The Commissioner responds that Wagner's claims are unfounded and that there is substantial evidence to support the ALJ's decision.

### A.    ALJ'S credibility determination

Wagner's initial, blanket assertion that the ALJ failed to consider her testimony regarding her chronic pain and resulting limitations is not borne out by the record. Although not mentioned by name, it is apparent that ALJ's analysis was informed by the Polaski factors. Also, as detailed

earlier, the ALJ addressed Wagner's subjective pain complaints at length but ultimately concluded that she was not entirely credible given the reasons set forth in detail earlier.

The "claimant's credibility is primarily a matter for the ALJ to decide." Anderson, 344 F.3d at 814. Having reviewed record, the court concludes the ALJ's determinations with respect to Wagner's credibility were supported by sufficient evidence and that this court must defer to these determinations, including their consequent impact on the determination of Wagner's RFC, even though the conclusions the ALJ reached may not be the ones this court would have reached based upon its consideration of the cold record. See Haggard, 175 F.3d at 594; Brockman, 987 F.2d at 1346

## B.     RFC determination

### 1.     Urinary incontinence

Wagner asserts that the ALJ was dismissive of her urinary incontinence problems, discounted her testimony regarding this issue without explanation, and, as a consequence, failed to take into consideration the fact that she would be required to take frequent breaks when making his RFC determination.

The record evinces that the ALJ did articulate his basis for discounting Wagner's testimony regarding her urinary incontinence. Specifically, he opined:

> The claimant testified to issues with urinary incontinence such that she had regular daily leakage requiring clothing changes 3-4 times a day. She also states that she requires her husband's assistance to properly clean herself after accidents. The record does reflect finding of uterine prolapse with grade 3-4 cystocele and stress urinary incontinence. However she was fitted for a pessary and was found to have no appreciable uterine prolapse as of her March 12, 2012, examination. There also was no reference to ongoing incontinence. The claimant had no further medical appointments after March 12, 2012. However, she did not reference any urinary issues during either her May 2012 psychiatric visit or her August 2012 psychological examination. Therefore, the undersigned cannot find that the above has been a

condition or caused any limitations for a full and consecutive 12-month period.

(Tr. 13).

The ALJ's summation of the medical evidence or lack thereof with respect Wagner's alleged incontinence is not entirely accurate. Notably, the ALJ ignores several mentions of urine leakage issues in earlier medical reports, albeit not of the severity to which the claimant testified to at the hearing. (Tr. 314-315) (diagnosis of incontinence and report of urinary leakage issues dating back two years).

Nevertheless, given the ALJ's conclusion regarding Wagner's credibility and the lack of medical evidence supporting Wagner's claims, the court cannot conclude that the ALJ erred with respect to concluding that frequent breaks would not be necessary to address incontinence issues, particularly if underclothing designed to address urine leakage was employed. See Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004); see also Gendel v. Astrue, No. CV 07-425-N-CWD, 2008 WL 5429805, at *4-5 (D. Idaho Dec. 31, 2008) ("The ALJ need not consider or include alleged impairments that have no support in the record . . . . The limitations presented by Petitioner's incontinence are not supported by substantial evidence in the record and accordingly, the ALJ did not need to include them in her hypothetical or RFC determination.").

## 2. Combination of other physical and mental impairments

Wagner also contends that the ALJ erred in concluding that she could work without an undue number of absences based on a combination of her physical and mental conditions. In the court's view, this presents a close question - at least based on the court's review of the cold record.

The reasons articulated by the ALJ for his RFC assessment have already been discussed in detail, but, essentially, he made his determination based upon: (1) Wagner's prior work history of

medium-level unskilled work and his evaluation that, although her condition had deteriorated some, it was not to the point of her being unable to perform light sedentary work on competitive basis; (2) the paper RFC assessments by state agency consultants; (3) the consultative physical examination by Dr. Jondahl; (4) the consultative mental examination by Dr. Kehrwald; and (5) the other reasons given by the ALJ for discounting Wagner's testimony, the import of which was that she was not capable of employment on a competitive basis.

But what gives the court cause for concern is that no testing was performed to determine Wagner's physical limitations and no questions were posed directly to those performing the physical and mental consultative examinations as to whether they believed Wagner was capable of working without an unacceptable number of absences. This, in turn, gives pause for concern over the weight the ALJ appears to have placed on what he did rely upon in making his determination with respect to Wagner's RFC and her ability to perform in a competitive environment.

One of the points that the ALJ made twice in his decision was Wagner's report to her psychiatrist in June of 2011 that she had engaged in a lot of "sandbagging" during the time of the Missouri River flooding in Bismarck. (Tr. 20 & 24). While the fact that Wagner reported feeling good about this activity was certainly probative with respect to her mental health issues, the ALJ also concluded that this physical activity was inconsistent with what Wagner was otherwise claiming in terms of her physical impairment.[3] Here, this court would not necessarily have made this

---

[3] The ALJ stated a page 12 of his decision:

> The claimant reported that she had been busy doing a lot of sandbagging and helping out in the community which made her feel good (Exhibit 12F 1). The undersigned has considered this activity and notes that it is inconsistent with her allegations of physical or mental limitations.

(Tr. 20). Then again, at pages 13-14, the ALJ stated:

> In sum, the above residual functional capacity assessment is supported by the longitudinal evidence

judgment without more information.

Notably, the ALJ never asked Wagner about the sandbagging during the hearing and "sandbagging" during that period of time could have meant many things. That is, the term was not limited to those who wielded heavy sandbags. Rather, "sandbagging" included, for example, sitting on a chair and holding a sandbag open while others shoveled in the sand. It also included standing at a sandbagging machine ("spider") and holding open sandbags while they were filled by the machine or, perhaps, tying the sandbags shut after they were filled. Activities such as these were often performed by the elderly and those with physical limitations who simply wanted to help out. And, they were activities that were performed with frequent rests and breaks.

Certainly, a fairer approach would have been for the ALJ to have asked Wagner about her sandbagging activity during the hearing to get a more complete picture. And, if Wagner had been toting 20-pound sandbags for hours, then the ALJ's point is particularly well-taken. However, if it was something significantly less, then the fact she was out doing some work and not sitting at home may be probative, but perhaps not to the extent the ALJ may have placed on it.

Another point of concern is with respect to Dr. Kehrwald's report of his consultative examination as to Wagner's mental state. Obviously, the ALJ sought this report because of her testimony at the hearing (which he later discounted to a significant extent) and Dr. Jondahl's statement in his report that Wagner was unemployable given what he perceived to be her mental state at the time of his examination. As noted earlier, the ALJ discounted Dr. Jondahl's statement

---

of record which reflects that the claimant is no more limited than allowed for therein. The undersigned again notes that the claimant acknowledged during her June 7, 2011, visit with Dr. Eick that she had been busy doing a lot of sandbagging and helping out in the community (Exhibit 12F 1). As referenced above, this activity is fundamentally inconsistent with her allegations from both a physical and mental perspective.

(Tr. 23-24)

about Wagner's employability because her mental state was much different when she met later that day with her psychiatrist and the ALJ's perception was that it (Dr. Jondahl's statement) was inconsistent with remainder of the record.

The ALJ discussed at length Dr. Kehrwald's report, stating:

In terms of the examining psychologist's observations and the claimant's mental status examination, these did not appear to reflect any greater limitation than allowed for in the mental residual functional capacity as established. The claimant presented with adequate hygiene and clean clothing. She was appropriate and mildly spontaneous with good eye contact and response latencies noted. The claimant was described as friendly and she was normal in terms of speech including volume, tone, and intonation. Her responses to questioning were logical and mildly elaborated, but with limited details noted. There was no blocking or use of unusual language. The claimant's affect was described as rather flat, but her mood was neither elevated nor depressed during the interview. While the claimant reported some history of hallucinations involving voices saying negative things, she denied any such issues on examination. The claimant's mental status examination did reveal some deficiencies but nothing reflecting greater limitations than allowed for in the residual functional capacity as established.

The claimant also underwent WAIS-IV intellectual testing with some mixed results identified. The claimant was noted as having general memory falling into the significantly deficient range. She was noted as having a general memory score of 67. This was influenced by her visual delayed memory score of 62. However, her other memory scores were quite a bit higher with working memory index of 88 referenced.

It was further noted that apart from the visual memory, the other factors fell into the low-average range with one just barely so. The claimant was also noted as generally falling into the borderline to low-average range on her index scores including 77 on Full Scale (FS); 87 on Verbal Comprehension (VC); 77 on Perceptual Reasoning (PR); 83 on Working Memory (WM); and 76 on Processing Speed (PS). These overall scores support a finding of no greater limitation than allowed for in the residual functional capacity as established.

This finding is also consistent with the claimant having engaged in simple unskilled work for an extended period at substantial gainful activity levels in the timeframe leading up the alleged onset date. The claimant was also given a global assessment of functioning score of 55 which the undersigned notes is likewise consistent with no greater than moderate mental limitation. In keeping with the above, the psychological consultant noted that he felt that the claimant might perform better

22

with more routine, non-public work.  The undersigned notes that this is consistent with the mental residual functional capacity as established above.

(Tr. 22-23) (internal citations to the exhibited omitted).  He then made reference to a statement at the end of Dr. Kehrwald's report that she would perform better with routine, non public work.

However, as noted by Wagner, the ALJ omitted any reference to the other statements made by Dr. Kehrwald that bore upon the issue of whether she could work without an unacceptable number of absences as noted in italics below:

> *Her functioning would appear to be limited by her lapses in concentration, some forgetfulness, and reduce[d] persistence.  She also may be less consistent in functioning or in attendance secondary to depression or anxiety.*  Her judgment was adequate and one might expect her to have some irritability with others but to relate in a normal fashion with the general public.  She may perform better with more routine, nonpublic work.  She may qualify for services from Vocational Rehabilitation. She should continue with her medication therapy. Some counseling related to her depression, anxiety, and adjustment to her current functioning may be helpful.

(Tr. 521-22) (emphasis added).

Obviously, Dr. Kehrwald was equivocal about the points most significant to whether Wagner was capable of working competitively.  Given this,  Dr. Jondahl's statement (which this court would give some weight, particularly since he is a trained physician and he too was conducting a consultative examination), and the combination of Wagner's impairments, there is certainly room for a conclusion different from the one reached by the ALJ with respect to Wagner's ability to work consistently without an unacceptable number of absences.

This court, however, can neither substitute its own judgment in place of the ALJ's interpretation or weigh the evidence *de novo*.  See Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997).  And here, the ALJ gave reasons for his ultimate determination and there appears to be sufficient record evidence to support them.

### C. **Hypotheticals**

Finally, Wagner takes the ALJ to task for what she characterizes as his failure to incorporate limitations identified by the consulting mental health examiner and those she attributes to her urinary incontinence. The real dispute here, however, is not with the hypotheticals per se but rather with the ALJ's determination of Wagner's RFC, including her ability to work without having an undue number of absences. The hypotheticals posed by the ALJ were consistent with the determinations he made concerning Wagner's physical and mental capabilities. In fact, one of the hypothetical questions assumed marginally less physical capacity than what he concluded was Wagner's RFC and the vocational expert still concluded that she would be capable of performing some types of sedentary work.

## IV. **CONCLUSION**

In this case, there is enough evidence supporting the Commissioner's decision to meet the "substantial" threshold and the decision to deny benefits falls within the zone of choice that prohibits this court from reversing the decision even though there is substantial evidence supporting a contrary outcome. Accordingly, Wagner's Motion for Summary Judgment (Docket No. 12) is **DENIED**, the Commissioner's Motion for Summary Judgment (Docket No. 15) is **GRANTED**, and that the above-entitled action is **DISMISSED**.

**IT IS SO ORDERED.**

Dated this 7th day of April, 2015.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court